## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARSHELL E. ANTONIOLO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 15-713-SLR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Angela Pinto Ross, Esquire, of Doroshow, Pasquale, Krawitz, Siegel & Bhaya, Wilmington, Delaware.  Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Dina White Griffin, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration.  Counsel for Defendant.  Of Counsel:  Nora Koch, Esquire, Acting Regional Chief Counsel, and Maija DiDomenico, Assistant Regional Counsel, Region III of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: September  14 , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I.    INTRODUCTION

Plaintiff Marshell E. Antoniolo ("plaintiff") appeals from a decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  The court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Currently before the court are the parties' cross-motions for summary judgment. (D.I. 7, 9)  For the reasons set forth below, plaintiff's motion will be denied and defendant's motion will be granted.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed an application for DIB on February 8, 2011, alleging disability beginning on February 1, 2006.  (Tr. 26)  Plaintiff's claim was initially denied on March 10, 2011, and after reconsideration on July 19, 2011.  (*Id.*)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 29, 2013.  At the hearing, plaintiff, who was represented by counsel, amended her alleged onset date to June 8, 2010.  (*Id.*)

On July 31, 2013, the ALJ issued an unfavorable decision finding that plaintiff was not disabled.  (*Id.*)  On March 23, 2015, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of defendant.  (Tr. 1) Having exhausted her administrative remedies, plaintiff initiated the present action.  (D.I. 1)

## B.    Medical History

Plaintiff was 45 years old as of the amended onset date of disability June 8, 2010. (D.I. 8 at 3) She has an 11th grade education and past work experience as a laundry attendant and housekeeper. (*Id.*) Several of plaintiff's treating physicians opined that she had a limited residual functional capacity due to chronic pain, lumbar disc disease, and/or carpal tunnel syndrome. (D.I. 8 at 8-9) Following is a summary of plaintiff's medical history with respect to those impairments at issue in this appeal.

### 1.    Chronic back pain

In January 2006, over four years before the amended onset date, plaintiff injured her back while on the job, pushing a laundry cart that weighed about 100 pounds. (D.I. 10 at 3) An MRI of the lumbar spine dated March 29, 2006, a few months after the injury, showed normal lumbar alignment. (Tr. 469) The flexion/extension sequences were degraded by motion, but showed no gross segmental instability. (*Id.*) There was a "tiny right central protrusion" at the T9-T10 that could be seen in the extension position only, and no cord compression at any level. (*Id.*) A second MRI taken the following year, on March 26 2007, showed mild neuroforaminal narrowing at the lower lumbar levels, secondary to early facet disease.[1] (Tr. 468) There was no focal disc abnormality. (*Id.*)

---

[1]    Neuroforaminal narrowing refers to a reduction in the size of the opening in the spinal column through which the spinal nerve exits. As this opening narrows, the nerve becomes compressed, which can lead to pain that radiates along the path of the nerve. http://www.spine-health.com/glossary/neuroforaminal-narrowing (last visited September 12, 2016). Here, the MRI showed that plaintiff's SI nerve roots were not impinged. (Tr. 468) Facet disease occurs when the joints degenerate. https://www.laserspineinstitute .com/back_problems/facet_disease/ (last visited September 12, 2016).

From July 2006 to October 2007, plaintiff received treatment for her back pain from Dr. Emmanuel Devotta, a pain management specialist. Plaintiff received four injections between July 2006 and May 2007. (Tr. 632-35) Plaintiff said she experienced relief for approximately two weeks following an injection, but experienced no significant improvement. (Tr. 629) Dr. Devotta also prescribed pain medication and muscle relaxers. (Tr. 624-630) In June 2007, plaintiff's pain level dropped to zero. (Tr. 624) Dr. Devotta noted that if plaintiff remained pain free after a month, he would discharge her. (Id.)

A month later, in July 2007, plaintiff reported "discomfort" in the lumbar region that was "overall tolerable" and rated as a 3/10 in severity. (Tr. 623) Dr. Devotta noted that the pain was not as severe as before the May 2007 injection and had been stable. (Id.) In September 2007, plaintiff reported pain as a 7/10. (Tr. 621-22) To formulate a plan of treatment, Dr. Devotta asked plaintiff to complete a functional capacity evaluation ("FCE") which would determine her work capacity. (Tr. 622)

An FCE was conducted on September 11, 2007 by PRO Physical Therapy. (Tr. 410-D.I. 4-8 at 51-54) The FCE reported that "considerable question be drawn as to the reliability/accuracy of [plaintiff's] subjective reports of pain/limitation" and that while plaintiff considered herself to be "crippled," this did not match with clinical observations as she was able to complete the four hour FCE. (Tr. 411) The FCE ultimately concluded that plaintiff did "not meet the Medium Physical Demand Level of a Laundry Person as she tested at the Light PDL." (Id.) Instead, plaintiff

> demonstrated decreased tolerance with walking, standing, sustained bending, and sustained low level work. Ms. Antoniolo demonstrated the following AROM and strength deficits: 75% limited lumbar flexion and 25% limited lumbar extension, left lateral flexion, and tight lateral flexion;

> 4/5 bilateral hip flexion and left knee flexion, 4+/5 right knee flexion,
> bilateral knee extension and left ankle dorsiflexion.

(Id.). The FCE recommended that plaintiff return to modified/restricted duty as a

laundry technician subject to restrictions: limit standing to an occasional basis with

frequent positional change, and limit walking to an occasional basis only (5-10 minute

increments). (Id.) There are no records from Dr. Devotta between October 2007 and

May 2010, suggesting that plaintiff stopped treatment with him during that time. (Tr.

620-21)

From February 2008 to August 2008, plaintiff sought treatment for her back pain

from her primary care physician, Dr. Marcia Castro. In August 2008, she reported a

pain level of 5/10. (Tr. 496-502) She tried flagging work at one point but quit because

of severe back pain. (Id.) Dr. Castro prescribed pain medication to be taken as

needed. (Id.)

Plaintiff also saw orthopedic surgeon, Dr. Bruce Katz. (Tr. 364-422) In an

examination on September 18, 2008, Dr. Katz noted tenderness in the lumbosacral

junction and restriction to the lumbar range of motion. (Tr. 369) Plaintiff's hip range of

motion was full and pain free and a straight leg raise test was negative bilaterally. (Id.)

An x-ray of the lumbosacral spine on the same date showed no gross instability and

normal disc space height. (Id.) An MRI of the lumbar spine dated October 1, 2008

showed isolated mild degenerative changes at the L5-S1 facet joints. (Tr. 371, 467)

There was no evidence of disc herniation and no significant stenosis.[2] (Tr. 467) At that

time, Dr. Katz concluded that plaintiff was capable of light duty status. (Tr. 388) This

---

[2]     Stenosis is a stricture of any canal or orifice. Stedman's Medical Dictionary, p.
1832 (28th Ed. 2006).

4

conclusion included an opinion that plaintiff was capable of sitting 8 hours, standing 4 hours, and walking 4 hours per work day. (Tr. 382-388)

In an initial consultation, Dr. Katz had discussed the different treatment options available for low back pain including facet joint blocks, surgery, and additional testing. (Tr. 365) On January 27, 2009, however, Dr. Katz concluded that plaintiff was not a candidate for surgery, because a discogram showed that plaintiff received pain only under very high pressurization. (Tr. 376) Dr. Katz advised plaintiff to continue with her "conservative" pain management and undergo an FCE to determine her permanent work status. (Id.) Until then, his recommended work status of light duty would remained unchanged. (Id.)

A second FCE was completed on April 24, 2009 by Pro Physical Therapy. (Tr. 380, 404-14) The FCE noted the presence of "near full, though not entirely full, effort" on plaintiff's behalf. (Tr. 405) Thus, plaintiff "may be able to do more physically at times than was demonstrated." (Id.) The FCE also noted that: "Overall test findings, in combination with clinical observation, suggest considerable question be drawn as to the reliability/accuracy of [plaintiff's] subjective reports of pain/limitation." (Id.) Plaintiff "may be able to do more at times than she currently states or perceives." (Id.) Accordingly, the FCE recommended that "[s]ignificantly more weight should be placed upon objective findings versus subjective reports." (Id.) Finally, the FCE concluded that plaintiff was capable of light duty work, but not able to return to her previous position as a laundry technician, because it had a medium physical demand. (Id.; Tr. 380) Afterwards, Dr. Katz released plaintiff for work, with the following restrictions adopted from the FCE:

5

work 8 hours per day; a maximum tolerance of 1-2 hours each of sitting, standing, and walking per work day; and light lifting, carrying, pushing, and pulling. (Tr. 380-81)

At the end of 2009, plaintiff reported to Dr. Castro that she was experiencing pain in her lower back after working in a nursing home. (Tr. 486) She had been taking Motrin with no relief. (*Id.*) In the beginning of 2010, plaintiff reported that she was working part-time pushing carts which aggravated her hand and back pain. (Tr. 482-86) Pain medications were helping. (*Id.*) In March 2010, plaintiff reported that she was going to physical therapy three times a week, which was "somewhat helping." (Tr. 480)

Also in March 2010, plaintiff returned to Dr. Devotta complaining of low back pain. (Tr. 607) Plaintiff attributed the pain to heavy duty work pushing large carts at a dry cleaners. (*Id.*; Tr. 613, 620) Upon examination, Dr. Devotta noted tenderness at the L4-S1. (Tr. 607) A straight leg raise test was 60 degrees bilateral and an MRI of the lumbar spine revealed facet arthropathy.[3] (Tr. 607) Dr. Devotta diagnosed bilateral lumbar facet joint syndrome.[4] (Tr. 607)

From March 2010 to June 2011, Dr. Devotta treated plaintiff's back pain with medication and injections. (Tr. 607-20; 674-76) The treatment seemed to provide "some relief," but plaintiff's pain would increase to an 8 or 9 with activity. (Tr. 610, 612-14) When plaintiff reported a pain level of 9 in October 2010, Dr. Devotta noted that "she does not look like she has a pain level of 9." (Tr. 612) In May 2011, Dr. Devotta

---

[3]      Arthropathy is "[a]ny disease affecting a joint." Stedman's Medical Dictionary, p. 161 (28th Ed. 2006).

[4]      Facet joint syndrome is pain at the joint between two vertebrae in the spine. Another term for facet joint syndrome is osteoarthritis. https://www.depuysynthes.com/ patients/aabp/understandingconditions/facetjointsyndrome (last visited September 12, 2016).

6

instructed plaintiff to obtain an MRI of the cervical spine, and once he reviewed the MRI he would plan her future treatment.  (Tr. 676)  An MRI, however, was never obtained. (D.I. 8 at 5)  At her last office visit with Dr. Devotta, in June 2011, plaintiff reported that her back pain was under control; she complained primarily of neck pain.  (Tr. 675)

After losing her insurance, plaintiff switched her care from Dr. Katz and Dr. Devotta to Christiana Care Adult Medicine, where she was primarily seen by Dr. Michael Gross M.D., and Dr. Narrani Kanapathippillai M.D.  (Tr. 728-77)  At her initial consultation on September 28, 2011, plaintiff reported that she had a history of two bulging discs in her lower back.  (Tr. 773)  She also reported a pain of 7 in her back. (Tr. 770)  Upon physical examination, Dr. Gross noted limited flexion and extension of the back, a normal gait, and a negative straight leg raise test.  (Tr. 776)  Dr. Gross also noted that the back pain was "controlled on Ibuprofen 800."  (Tr. 765, 776)  The treating physicians at Christiana Care Adult Medicine continued to prescribe pain medication, and recommend physical therapy.  (Tr. 728-77)

At a follow-up appointment on December 16, 2011, plaintiff reported that her back pain had not changed in character or intensity.  (Tr. 770)  Nevertheless, upon examination, Dr. Kanapathippillai found an abnormal gait and a positive straight leg raise test.  (Tr. 771)  When plaintiff returned in January 2012 to fill out disability paperwork, Dr. Kanapathippillai observed limited flexion and extension of the back and a positive straight leg raise test, but a normal gait.  (Tr. 766)  Plaintiff reported back pain as a 6/10.  (Tr. 765)  In March 2012, Dr. Gross noted that on a straight leg raise test, plaintiff's pain was limited to the upper thigh.  (Tr. 761)  Dr. Gross did not indicate whether this meant the test was negative or positive.

In July 2012, plaintiff finished a course of physical therapy which she reported helped some. (Tr. 751) At that time, Dr. Gross noted that "[l]ooking back, [I] don't have the actual results from prior imaging." (Tr. 752) He made a note to attempt to obtain copies of the imaging, but there are no notes that the imaging was ever obtained or that new imaging was done. (*Id.*) In August 2012, plaintiff denied back pain. (Tr. 748) The next month, however, plaintiff reported back pain and that her disability hearing was next month. (Tr. 744)

In November 2012, plaintiff reported that she continued having lower back pain from a herniated disc. (Tr. 740) Upon examination, Dr. Gross noted tenderness along the lumbar spine L5-S1, non-radiating and no paravertebral tenderness.[5] (Tr. 741) A straight leg raise test was negative bilaterally. (*Id.*) The back pain was controlled with heating pad and intermittent ibuprofen. (*Id.*) At her last appointment in the record, in March 2013, plaintiff denied back pain. (Tr. 735)

### 2.    Carpal tunnel syndrome

In June 2009, plaintiff saw orthopedic surgeon, Dr. Andrew Gelman, for right hand complaints. (Tr. 567) She described a numbness sensation in all her digits. (*Id.*) Upon examination, Dr. Gelman found that plaintiff had full movement of all digits and wrist, no thenar atrophy, and no pain over Guyon's tunnel. (*Id.*) He also found that plaintiff had "provocative" Tinel's while the Phalen's test was negative.[6] (*Id.*) Dr.

---

[5]    Paravertebral means adjacent to the vertebral column. Stedman's Medical Dictionary, p. 1424 (28th Ed. 2006). Dr. Gross is stating that the tenderness is only along the lumbar spine and does not extend to adjacent areas.

[6]    Tinel's is a sensation of tingling, or of "pins and needles" felt along the course of a nerve. Stedman's Medical Dictionary, p. 1772 (28th Ed. 2006).

Gelman recommended conservative care to include a brace, ibuprofen, and an injection. (*Id.*) Plaintiff declined the injection. (*Id.*)

In January 2010 and February 2010, plaintiff saw Dr. Gelman again complaining of right hand symptoms. (Tr. 565-566) He increased her medication and decided to wait on any injections until it was determined that the medication was ineffective. (Tr. 566) At that time, Dr. Gelman's findings were "nonspecific" and he was "leery towards any type of operative treatment." (Tr. 565)

In March 2010, plaintiff reported to Craig Katz, a certified physician assistant in Dr. Gelman's office, that she was still experiencing some discomfort in her hand and had not gotten into physical therapy because the facility did not offer hand therapy. (Tr. 564) P.A. Katz instructed plaintiff to continue her medications and change physical therapists. (*Id.*) Plaintiff obtained physical therapy for her hand from April to May 2010. (Tr. 655-67) She reported that her hands were "much better" and was discharged in June 2010 with satisfactory goal achievement. (Tr. 655, 660)

In September 2010, plaintiff requested a right carpal tunnel release, which Dr. Gelman performed on February 9, 2011. (Tr. 563, 568) There are no records of the follow-up with Dr. Gelman. A month after surgery, plaintiff reported to Steven D. Grossinger, D.O., a specialist in neuropain, that she was recovering and had "less hand symptoms," but there continued to be "some numbness and tingling." (Tr. 653) He prescribed Neurontin. (*Id.*)

## C.    Medical Opinions

On December 28, 2010, Dr. Devotta completed a Residual Functional Capacity Evaluation on a check-box form. (Tr. 514-516) Dr. Devotta indicated that plaintiff could:

9

lift 10 pounds frequently and 20 pounds occasionally; walk and stand 5-10 minutes; sit
for 15-20 minutes; remain at a work station with a sitting or standing option a maximum
of 2-3 hours in an 8-hour work day. (*Id.*) Dr. Devotta also indicated that plaintiff would
need to: lie down or elevate her legs 30-60 minutes per work day; take 2-3 unscheduled
breaks; and miss 3-4 days a month as a result of her pain. (Tr. 514) When asked
about restricted activities, Dr. Devotta indicated that plaintiff could: never crouch/squat,
climb ladders, or push/pull; rarely twist, stoop, or reach; and occasionally climb stairs,
handle, finger, or feel objects. (Tr. 515) Dr. Devotta noted that the restricted activities
"may aggravate her pain." (*Id.*) Finally, when asked if plaintiff was capable of
performing sedentary work, Dr. Devotta checked no on a full-time basis, but yes on a
part-time basis.[7] (Tr. 516) On May 2, 2011, Dr. Cross completed a Residual Functional
Capacity Evaluation for plaintiff on the same check-box form and provided the exact
same answers and notations as Dr. Devotta for every question. (Tr. 583-85)

On January 26, 2012, Dr. Kanapathippillai completed a Residual Functional
Capacity Evaluation on the check-box form. (Tr. 647-49) She diagnosed "lumbar disc
displacement" and indicated that plaintiff could: lift 5 pounds frequently and 20 pounds
occasionally; sit, stand, or walk for 30 minutes at a time and 2 hours maximum in an 8-
hour work day; remain at a work station with a sitting or standing option a maximum of 4
hours in an 8-hour work day. (Tr. 647) Dr. Kanapathippillai also indicated that plaintiff
would need to: lie down or elevate her legs 30-60 minutes per work day; take 3
unscheduled breaks; and miss 3-4 days a month as a result of her pain. (*Id.*) For

---

[7]     The form only asks about sedentary work, not light, medium, or heavy work.  It
also does not ask the physician to select the level of physical exertion plaintiff can
perform on a range from sedentary to heavy.

restricted activities, Dr. Kanapathippillai gave the same answers as Dr. Devotta. (Tr. 648) Finally, Dr. Kanapathippillai opined that plaintiff was not capable of full-time sedentary work, because she had a work related incident on January 26, 2006 "which caused severe disc (lumbar) disease." (Tr. 649) She noted that she relied on an MRI and EMG to reach her conclusions.[8] (Id.)

Dr. Gross completed a one-page check box evaluation on September 6, 2012. (Tr. 651) He diagnosed plaintiff with lumbar disc displacement and carpal tunnel syndrome. (Id.) He indicated that plaintiff could: lift less than 10 pounds rarely; never lift 10 pounds or more; rarely finger and grasp; occasionally handle; never stoop, bend, or crouch; and miss more than 4 days a month due to her impairments. (Id.)

Finally, Dr. Joseph Michel, of the state agency, evaluated plaintiff's medical evidence on March 2, 2011. (Tr. 83-91) He limited plaintiff to lifting 20 pounds occasionally, 10 pounds frequently, 4 hours standing and walking, and 6 hours sitting. (Tr. 88) The following activities were limited to occasional: climbing stairs, balancing, stooping, kneeling, crouching, and crawling. (Id.) Dr. Michel concluded that plaintiff's residual functional capacity ranged from modified light to sedentary. (Tr. 90) Dr. Vinod Kataria evaluated plaintiff's file on July 19, 2011 and affirmed Dr. Michel's decision. (Tr. 93-100)

## D.    Vocational Expert's Testimony

Plaintiff has relevant past work history as a housekeeper and laundry worker. (Tr. 66) The housekeeper position is unskilled, light work. (Id.) The laundry worker

---

[8]     Dr. Kanapathippillai does not identify the MRI on which she relied. There are no MRIs in the record other than the three between 2006 and 2008 previously described in Section II(B)(1). (See Tr. 467-69)

positon is unskilled, medium work. (*Id.*) For the first hypothetical, the ALJ asked the vocational expert ("VE") to consider a person of plaintiff's age, education, and work experience; able to lift 20 pounds occasionally and 10 pounds frequently; sit for 6 hours and stand/walk for 4 hours in an eight-hour workday; occasionally climb stairs, balance, stoop, kneel, crouch, crawl, handle, finger, and feel; and not climb ladders. (Tr. 67) The VE testified that such a person could not perform plaintiff's past work, but there were other jobs that existed in significant numbers in the national economy that the person could perform. (*Id.*) Those jobs were: chaperone, usher/lobby attendant, and hostess. (Tr. 67-68) The second hypothetical contained all the same postural limitations, but the individual had the exertional capacity for sedentary work, needs to have the ability to change positions from sitting to standing at will. (Tr. 68) Under these circumstances, the VE testified that there was virtually no work available. (*Id.*)

## E.    The ALJ's Findings

Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2012. (Tr. 28) Plaintiff did not engage in substantial gainful activity from her amended alleged onset date of June 8, 2010 through her date last insured. (*Id.*) The ALJ determined that plaintiff had severe lumbar facet joint syndrome; tension/migraine headaches; and carpal tunnel syndrome on the right, status post release. (Tr. 28) Plaintiff's Graves disease was not severe. (Tr. 28-9) The ALJ found that none of plaintiff's impairments or combination of impairments met or medically equaled a listed impairment. (Tr. 29)

The ALJ concluded that, through the date last insured, plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional

restrictions: sit 6 hours and stand/walk 4 hours in an 8-hour workday; occasionally climb stairs, balance, stoop, kneel, crouch and crawl; never climb ladders. (*Id.*) Accordingly, plaintiff was unable to perform any past relevant work. (Tr. 33) Considering plaintiff's age, education, work experience, and residual functional capacity, however, the ALJ concluded that she was capable of performing jobs that existed in significant numbers in the national economy. (*Id.*) As a result, plaintiff was not under a disability, as defined in the Social Security Act, at any time from June 8, 2010, the alleged onset date, through June 30, 2012. (Tr. 34)

## III.    STANDARD OF REVIEW

A reviewing court will reverse the ALJ's decision only if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Where the ALJ's findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

13

In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

Plaintiff essentially makes two arguments in support of her motion for summary judgment. First, the ALJ erred in assigning little weight to the opinions of her treating physicians. (D.I. 8 at 12-18) Second, the ALJ formulated an RFC that failed to include all of plaintiff's credibly established limitations. (*Id.* at 19-20) Each of these arguments are addressed in turn.

### A. Opinions of Treating Physicians

Plaintiff claims that the ALJ erred in giving "little weight" to the opinions of her treating physicians. (D.I. 14 at 11-15) If a treating physician's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it will be given controlling weight. 20 C.F.R. §404.1527. Thus, an ALJ may give little weight to a physician's opinion that is inconsistent with the medical evidence of record and with her own examination findings. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (holding that an unsupported diagnosis is not entitled to significant weight); *Hall v. Comm'r of Soc. Sec.*, 218 F.App'x 212, 215 (3d Cir. 2007). If the ALJ does not give a treating physician's opinion controlling weight, she must provide her reasons. 20 C.F.R. §404.1527.

Here, the ALJ gave several specific reasons why each treating physician's opinion was entitled to "little weight."  Overall, the ALJ found that the treating physicians' severe restrictions were inconsistent with or unsupported by the physicians' contemporaneous treatment notes and other objective medical evidence in the record. (Tr. 31-32)  More specifically, the ALJ observed that Dr. Devotta's treatment notes documented few physical findings, and his opinion was founded upon plaintiff's subjective pain complaints.  (*Id.*)  For each of plaintiff's visits, Dr. Devotta's treatment notes would state "on examination of her lower back, there is … tenderness to palpation."  (*See, e.g.*, Tr. 629)  Presumably, Dr. Devotta would detect the tenderness, because plaintiff would report feeling pain upon palpation.  As a result, the physical findings of tenderness ultimately depended upon plaintiff's subjective reports.  An ALJ "may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted."  *Morris v. Barnhart*, 78 F. App'x. 820, 824-25 (3d Cir. 2003).  The ALJ also noted that in April and June of 2011, after Dr. Devotta issued his opinion, he reported that plaintiff's back pain was under control.  (Tr. 31; *see also* Tr. 609, 675)

The ALJ noted that Dr. Castro issued an opinion that was essentially "identical" to Dr. Devotta's, but her treatment notes documented only a few office visits since her amended onset date in June 2010 and repeatedly stated that the plaintiff treated elsewhere for her back pain.  (Tr. 32)  As the ALJ correctly observed, plaintiff had five office visits with Dr. Castro in the year after her amended onset date.  (Tr. 470-476, 68-83)  At each of those visits, plaintiff's chief complaint for which she sought treatment

was unrelated to low back pain.[9]  (*Id*.)  None of Dr. Castro's treatment notes after June 2010 contain either objective physical findings or subjective reports regarding plaintiff's back pain.  (*Id*.)  Before the amended onset date, some of Dr. Castro's notes contained subjective reports of back pain, but still no objective physical findings.  (*See, e.g.*, Tr. 478, 482, 484, 486)

The ALJ gave Dr. Kanapathippillai's opinion little weight, because the notes from the corresponding office visit when she completed the disability paperwork were not consistent with the severe restrictions in the opinion.  (Tr. 32)  As the ALJ noted, plaintiff reported during the visit that a gel worked very well in controlling her back pain and that she did not use heating pads anymore.  (*Id*.; Tr. 766)  Dr. Kanapathippillai recommended that plaintiff "try physical therapy," "continue using the gel," and follow up in two months.  (Tr. 32, 766)  Moreover, in plaintiff's follow-up visit, plaintiff "reported that her back pain was generally better," she had not yet started physical therapy, and was "only occasionally" using lidocaine patches.  (*Id*.; Tr. 763)  The ALJ concluded that this "conservative treatment" did not support the severe limitations in the opinion.  (Tr. 32)

The ALJ appropriately found that plaintiff's conservative treatment history (and her favorable response to it) was directly at odds with the doctors' opinions that plaintiff was totally debilitated due to chronic back pain.  *See* 20 C.F.R. § 404.1527(c)(2)(i), (ii) (noting that the nature and extent of treatment is a relevant factor for evaluating medical opinion evidence); *Garrett v. Comm'r*, 274 Fed. App'x 159, 164 (3d Cir. 2008) (finding substantial evidence supported ALJ's decision where "[t]he ALJ noted that the

---

[9]        The complaints would range from sore throat to headache.  (*Id*.)

16

conservative treatment [claimant] received for her impairments indicated that they were not as debilitating as she claimed").

The ALJ identified several instances where Dr. Gross's opinion was not supported by his medical records. For example, Dr. Gross opined that plaintiff would have severe manipulative limitations and restricted functional capacity due to carpal tunnel syndrome, but his medical records do not even mention a complaint related to carpal tunnel syndrome. (Tr. 32) In addition, the treatment notes documented conservative treatment and contained minimal diagnostic and physical exam findings, which did not support the severe restrictions in sitting, standing, walking, and lifting. (*Id.*) Finally, the ALJ noted that plaintiff stopped attending physical therapy after June 20, 2012, even though she reported that it helped. (*Id.*; Tr. 685) Accordingly, the ALJ gave little weight to Dr. Gross's opinion.

The other evidence in the record to which plaintiff points does not contradict the ALJ's findings. First, plaintiff claims that the ALJ should have relied on Dr. Katz's opinion regarding plaintiff's physical limitations as support for giving the opinions of other treating physician's great weight. However, "[t]he decision to deny great weight to a treating source opinion must be supported by objective medical evidence." *Griffies v. Astrue*, 855 F.Supp.2d 257, 274 (D. Del. 2012). Another physician's opinion is not objective medical evidence. The ALJ's reasons for the weight she attributed to each

treating physician's opinion was appropriately confined to the objective medical evidence.[10]

Second, plaintiff claims that the ALJ failed to consider a positive straight leg raise test by Dr. Devotta. (D.I. 8 at 16-17)  But plaintiff failed to provide an accurate cite to the record and the court could not find a positive straight leg test by Dr. Devotta. (Id. (citing Tr. 604, 610, 612, 613, 620))  The court did find a note by Dr. Devotta in December 2006 and January 2007 of "SLRT 60 degrees bilateral," but it is unclear whether that means the straight leg raise test was positive or negative. (Tr. 627-28) Even if it was positive, the test was over three years before plaintiff's amended onset date, and plaintiff had several negative straight leg tests after this date. (See Tr. 369 (Sept. 2008); Tr. 776 (Sept. 2011); Tr. 741 (Nov. 2012)).

Third, the ALJ did not err, as plaintiff claims, by failing to discuss plaintiff's three MRIs. (D.I. 8 at 17)  As plaintiff admits, the MRIs were taken several years before the amended onset date, making them somewhat stale. (Id.)  The MRIs were also either irrelevant to plaintiff's claimed impairments or provided additional evidence that the plaintiff was not disabled.  The March 2006 MRI was of plaintiff's thoracic spine, not her lumbar spine, which was the source of plaintiff's impairments. (Tr. 469)  Moreover, the

---

[10]    For similar reasons, the ALJ was not required, as plaintiff claims, to reconcile the fact that Dr. Michel, in his state agency review, gave Dr. Devotta's opinion "controlling weight," but reached different conclusions as to plaintiff's residual functional capacity. (See D.I. 8 at 18; Tr. 87)  The ALJ was only required to consider whether the opinion was supported by objective medical evidence.  Griffies, 855 F.Supp.2d at 274.

thoracic spine MRI, like the two lumbar spine MRIs, were essentially normal, showing only mild degenerative changes.[11]  (Tr. 467-68)

Finally, the case on which plaintiff relies, *Bentzen v. Astrue*, 46 F.Supp.3d 489 (D. Del. 2014), is inapposite.  (D.I. 8 at 18)  In that case, the ALJ relied on normal findings of alertness, reflexes, and gait, as well as full muscle strength and tone to conclude that the claimant was not disabled by severe low back pain. *Bentzen*, 46 F.Supp.3d at 501.  The court appropriately reversed the ALJ's findings on the grounds that those objective medical findings do not preclude a diagnosis of severe lower back pain. *Id.* Here, the ALJ did not rely on similar types of medical evidence to reach her conclusion.  Instead, she appropriately identified substantial evidence relevant to the severe impairments plaintiff claimed.  Accordingly, the ALJ did not err is giving little weight to the opinions of plaintiff's treating physicians.

## B.     Credibly Established Limitations

Finally, plaintiff claims that the ALJ erred by presenting a defective hypothetical question that failed to include all of the plaintiff's credibly established limitations. (D.I. 8 at 19)  A hypothetical question must include all of the claimant's "credibly established limitations." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  Accordingly, a limitation that is supported by medical evidence, and "otherwise uncontroverted in the record," must be included in the hypothetical. *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014).  "However, where a limitation is supported by medical evidence, but is

---

[11]     Considering the essentially normal findings in the MRIs, it is puzzling that Dr. Kanapathippillai's opinion claims to have relied on the MRI's to diagnose lumbar disc displacement.  (Tr. 647)  It is particularly puzzling considering that Dr. Kanapathippillai completed her opinion in January 2012, but as of July 2012, her co-worker, Dr. Gross, noted that the office still needed to obtain copies of plaintiff's imaging.  (Tr. 752)

opposed by other evidence in the record, the ALJ has discretion to choose whether to include that limitation in the hypothetical." *Id.*

According to plaintiff, the ALJ should have given controlling weight to the opinions of plaintiff's treating physicians and, as a result, included the limitations in those opinions in her hypothetical questions. (D.I. 8 at 19)  Because the ALJ did not err in giving little weight to the opinions of plaintiff's treating physicians, for the reasons explained above, the hypothetical questions were not deficient for the reasons plaintiff claims. *See, e.g., Miller v. Colvin*, 2015 WL 9484464, at *10 (D. Del. Dec. 29, 2015) (holding that a hypothetical question was not incomplete when the ALJ did not include limitations from treating physicians' opinions that were appropriately given little weight).

## V.    CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and the defendant's motion for summary judgment is granted.  An appropriate order shall issue.